

U.S. Department of Justice

United States Attorney
Eastern District of New York

DMP:MTK

271 Cadman Plaza East
Brooklyn, New York 11201

September 21, 2020

By ECF

The Honorable Roanne L. Mann
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Baimadajie Angwang
             Magistrate Docket No. 20-837 (RLM)

Dear Judge Mann:

      Later today, the defendant Baimadajie Angwang ("Angwang") is scheduled to be arraigned before Your Honor in the above-referenced matter. The government respectfully submits that the Court should enter a permanent order of detention because the defendant presents a serious risk of flight. As set forth in more detail below, the defendant is a member of the New York City Police Department ("NYPD") and United States Army Reserve ("USAR") who has served as an intelligence asset to the New York-based consulate of the People's Republic of China (the "Consulate"). As the Court is aware, the Consulate is inviolable under applicable international law. Furthermore, the defendant has significant familial ties to the PRC and apparent access to substantial financial resources to aid his flight from justice.[1]

I.    Background

      The defendant is charged in a complaint with acting as an agent of the government of the People's Republic of China ("PRC") without prior notification to the Attorney General, in violation of Title 18, United States Code, Section 951; committing wire fraud, in violation of Title 18, United States Code, Section 1343; making false statements, in

---

[1]    Detailed herein is a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings).

violation of Title 18, United States Code, Section 1001; and obstructing an official proceeding, in violation of Title 18, United States Code, Section 1512(c).

As detailed in the complaint, Angwang, a naturalized United States citizen who is currently serving in the USAR and is employed as an officer in the NYPD has, among other things, (1) reported to the Consulate on the activities of ethnic Tibetans, and others, in the New York metropolitan area, (2) spotted and assessed potential ethnic Tibetan intelligence sources in the New York metropolitan area and beyond, (3) identified potential threats to the PRC in the New York metropolitan area, and (4) provided Consulate officials access to senior NYPD officials through invitations to official NYPD events.  Importantly, Angwang holds a "Secret" security clearance as a member of the USAR.

Since prior to 2018 and through the present, Angwang has maintained a relationship with at least two PRC officials stationed at the Consulate (hereinafter "PRC Official-1" and "PRC Official-2," respectively).  PRC Official-2 is believed to have been assigned to the "China Association for Preservation and Development of Tibetan Culture," a division of the PRC's United Front Work Department ("UFWD").  This Department is responsible for, among other things, neutralizing sources of potential opposition to the policies and authority of the PRC.  To achieve these goals abroad, the UFWD seeks to co-opt ethnic Chinese individuals and communities living outside the PRC.  UFWD officials often meet with local association groups whose purpose is to, among other things, connect Chinese emigrants from common geographic areas and ethnic backgrounds.  The UFWD's purpose in meeting with these groups is to secure political, moral and financial support for the PRC and to maintain control over potentially problematic groups, such as religious and ethnic minorities.

Recorded conversations have revealed that PRC Official-2 has been a "handler" of Angwang; in other words, Angwang received tasks from, and reported back to, PRC officials.  From August 21, 2014, through August 11, 2017, Angwang called and texted PRC Official-1's cellular telephone on at least 53 occasions.  From in or about and between June 2018 through March 2020, Angwang called and texted PRC Official-2's cellular telephone on at least 55 occasions.  Furthermore, Angwang has been observed entering the Consulate on numerous occasions during these time periods.

As detailed in the complaint, on numerous occasions, Angwang and PRC Official-2 discussed Angwang's successful recruitment as a PRC asset.  For example, Angwang stated: (1) "Let them [superiors in Beijing] know you have recruited one in the police department"; (2) "but at least let them [PRC Official-2's superiors] know, hey, you have someone in the police here"; (3) "they [PRC Official-2's superiors] should be happy . . . because you have stretched your reach into the police."  Angwang and PRC Official-2 also discussed how Angwang could "support [PRC Official-2's] work."  Similarly, Angwang asked PRC Official-2 for taskings and volunteered to assist PRC Official-2 by providing information from NYPD systems.

2

In additional recorded conversations, Angwang discussed his desire to further the goals and objectives of the PRC government. For example, Angwang stated that his motivation to be promoted in the NYPD was to assist the PRC and bring "glory to China." If Angwang could not be promoted within the NYPD, he stated that "he might as well as be a government employee in China." Similarly, Angwang stated that one of his goals in inviting PRC Official-2 to official NYPD events was to "raise our country's soft power," and offered to provide information "whatever is worth money or not worth money to your side."

Angwang also provided PRC Official-2 with the names of Tibetan individuals as well as groups of disenfranchised Tibetans for PRC Official-2 to recruit as potential intelligence sources. One of these individuals was a Tibetan-American who had run for public office in another state. PRC Official-2 instructed Angwang to "send" him the information on this individual so that he could "see if other Tibetans know him." Furthermore, Angwang provided suggestions on the best methods of recruiting these individuals. In response, PRC Official-2 directed Angwang to provide additional information about these individuals and groups. Angwang also attended Tibetan community meetings and reported back to PRC Official-2 on the substance of those meetings. In fact, in one such communication, Angwang complained about having to attend a meeting at an inconvenient location. Angwang wanted to give PRC Official-2 a "heads up" before not attending, and PRC Official-2 instructed Angwang not to attend the meeting.

At one point in Angwang's relationship with PRC Official-2, Angwang was asked by the NYPD to participate in an interview with a television station affiliated with the Fulangong, a self-described anti-PRC group. PRC Official-2 instructed Angwang not to conduct the interview. PRC Official-2 further provided Angwang with potential excuses to provide the NYPD with as to why Angwang could not conduct the interview. There is no record of Angwang conducting the interview.

Angwang also provided PRC Official-2 with information about Chinese ethnic minorities who likely harbored anti-PRC views and who presently worked for elected officials in New York State. Angwang informed PRC Official-2 that these individuals may "chant slogans" and "utter nonsense" against the PRC, causing "more work for you."

In addition to this conduct, Angwang, in connection with his service in the USAR, has made material false statements on his SF-86C Questionnaire for National Security Positions. Specifically, Angwang falsely denied that he had contacts with a foreign government or its consulate, when he had done so as described above, and falsely denied that he had close and continuing contacts with foreign nationals, including his family members who live in the PRC, some of whom were affiliated with the People's Liberation Army. Accordingly, Angwang is also charged with committing wire fraud, making false statements and obstructing an official proceeding, in violation of 18 U.S.C. §§ 1001, 1343, and 1512.

II. <u>Legal Standard</u>

Under the Bail Reform Act, Title 18, United States Code, Section 3141, <u>et seq</u>., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. <u>See</u> <u>United States v. Jackson</u>, 823 F.2d 4, 5 (2d Cir. 1987).

In addition, the Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. <u>See</u> 18 U.S.C. § 3142(g). As discussed below, these factors weigh heavily against pretrial release.

III. <u>The Court Should Enter a Permanent Order of Detention</u>

The investigation has revealed that the defendant enjoys access to significant liquid financial assets, much of which are located in the PRC—the defendant's place of birth. Given the defendant's sole employment as an NYPD officer, these large transactions, as described below, are extremely unusual and suspicious. Additionally, the defendant has significant familial and community ties to the PRC that make him a unique risk of flight. In particular:

- Angwang's father is a retired member of the PRC's People's Liberation Army ("PLA") and a PRC communist party member. Angwang's brother is currently serving as a reservist in the PLA. Angwang's mother is a retired government official and also a PRC communist party member. Notably, Angwang's father, mother and brother reside in the PRC.

- Angwang has significant financial ties with his family members and others in the PRC. For example, on or about April 20, 2016, Angwang wired $100,000 from a U.S. bank account held in Angwang's name to a PRC account held in the name of his brother. On or about May 18, 2016, Angwang wired $50,000 from a different U.S. bank account held in his name to a PRC account held in the name of another individual. That these sums transferred from Angwang's accounts in the United States are so large strongly suggests that Angwang has significant financial resources here that could be used to aid his flight.

- Angwang has also received multiple substantial wire transfers from the PRC. For example, on or about May 23, 2016, a U.S. bank account held in Angwang's name received $49,985 from an account held in the name of

4

Angwang's brother in the PRC. Moreover, on or about January 29, 2014, a U.S. bank account jointly held in the name of Angwang and Angwang's wife received separate credits of $50,000 and $20,000 from an account held in the name of an individual at the Bank of China in New York. The fact that Angwang has received such significant sums from individuals in the PRC also suggests that such funds would be available – to the extent he needed them – to aid his flight.

Importantly, the manner in which Angwang obtained his U.S. citizenship suggests that he committed a fraud on the United States, and therefore also points in favor of detention. Angwang initially traveled to the United States on a cultural exchange visa. Angwang ultimately overstayed a second visa and eventually sought asylum in the United States on the basis that he had allegedly been arrested and tortured in the PRC due partly to his Tibetan ethnicity. Yet, despite alleging torture and persecution at the hands of PRC security officials, the government's investigation has revealed that Angwang has traveled back to the PRC on numerous occasion since his asylum application was granted. These are not the actions of an individual who fears torture or persecution at the hands of the PRC, thus showing that his U.S. citizenship was secured through false pretenses.

Angwang has also requested special travel favors due to his relationship with the Consulate. Indeed, Angwang referred to himself as a PRC asset when he lobbied PRC Official-2 for an extended PRC travel visa. Angwang sought a 10-year visa on the basis that "it's hard to find people like us, the 100 percent type . . . so enthusiastic." Angwang also advised PRC Official-2 that the issuance of 10-year visas to certain Tibetans could be a means to recruit intelligence assets. Given that Angwang considered himself the "100 percent type," he is likely to use his access to PRC officials to seek assistance in fleeing prosecution in the United States. Moreover, should the defendant enter the PRC Consulate during any period of pretrial release, the government would be unable to cause him to return for future court appearances because law enforcement agents are prohibited from entering inviolable diplomatic facilities.

As set forth below, the factors to be considered in the detention analysis show that the defendant presents a substantial risk of flight if released on bond. Accordingly, the Court should enter a permanent order of detention pending trial.

### A.    The Nature and Circumstances of the Offense Charged

The charged offenses are extremely serious. The defendant is charged with acting as an illegal agent of a foreign power, and acted for the benefit of the PRC in all the ways set forth above. Moreover, while acting as an illegal agent of a foreign power, Angwang maintained a "Secret" security clearance with the Department of Defense. As discussed in the complaint, had USAR background investigators been aware of the full extent of Angwang's contact with foreign government officials, Angwang would not have been permitted to maintain his Secret security clearance. Furthermore, if the USAR had been

5

aware of the full extent of Angwang's contacts with PRC Official-2, Angwang would have been discharged from service in the USAR.

In this case, Angwang faces a maximum sentence of 55 years' imprisonment. The prospect of a lengthy term of incarceration confirms the defendant's status as a serious risk of flight. Indeed, there is every reason to think that he will make efforts to flee from the United States so that he can avoid the prospect of a lengthy prison term.

### B. The Weight of the Evidence

The evidence against the defendant includes, inter alia, (1) recorded communications between Angwang and his PRC handler, (2) the testimony of individuals who observed Angwang with his PRC handlers, (3) surveillance photographs of Angwang entering and exiting the Consulate, (4) electronic communications between Angwang and others demonstrating his strong ties to the PRC through his family members and other individuals, known and unknown, (5) financial records demonstrating that Angwang has access to large sums of money, including unusually large dollar value wire transfers to and from the PRC. Accordingly, this factor weighs in favor of a finding that the defendant is a flight risk.

### C. The Defendant's History and Characteristics

The defendant's history and characteristics also confirm that he presents a substantial risk of flight. Indeed, the defendant, despite serving in unique positions of authority in the United States, i.e., as a NYPD officer and a USAR non-commissioned officer, has betrayed the sacred trust afforded to him by his country. He swore an oath to serve and protect and to defend the United States, and has betrayed that oath through his acts on behalf of the PRC. Indeed, given the defendant's access to sensitive information as a police officer and his "Secret" level security clearance as a soldier, this breach of trust is all the more egregious.

The defendant was born in the PRC and retains substantial familial ties to that country, as well as access to untold wealth. The defendant has also frequently traveled to the PRC. Moreover, since he faces a sentence of up to 55 years' imprisonment, the defendant has every incentive to flee. Were the defendant to flee the United States, he would have access to considerable wealth to aid his flight and the United States would have limited ability to recapture or extradite him. Notably, the United States does not have an extradition treaty with the PRC. Moreover, the United States would not be able to recapture the defendant were he to enter the PRC Mission or PRC Consulate—both of which are located in Manhattan—during his pretrial release. Additionally, as discussed above, despite alleging torture and persecution at the hands of PRC security officials, Angwang has traveled back to the PRC on numerous occasion since his asylum application was granted, showing that he has no problem committing a fraud against the United States.

For all of these reasons, the government respectfully submits that the defendant represents a serious risk of flight if released on bond.

IV.     Conclusion

   For all of the foregoing reasons, the defendant should be detained pending trial.  The defendant is charged with extremely serious offenses, which carry a potential sentence of 55 years' imprisonment.  The government respectfully submits that no condition or combination of conditions will assure the defendant's return to court, or his compliance with the Court's directives, and the Court should thus enter a permanent order of detention pending trial.

            Respectfully submitted,

            SETH D. DUCHARME
            Acting United States Attorney

        By:  /s/ Michael T. Keilty
            Michael T. Keilty
            Assistant U.S. Attorney
            (718) 254-7000

cc:  Clerk of Court (RLM) (by ECF)
    Defense Counsel (by email)