# LAW OFFICE OF JOHN F. CARMAN

Attorneys at Law
666 Old Country Road
Suite 501
Garden City, New York 11530
(516) 683-3600
Facsimile
(516) 683-8410

OF COUNSEL
SUSAN SCARING CARMAN, ESQ.
MATTHEW W. BRISSENDEN, ESQ.

ASSOCIATE ATTORNEY
SARA M. PERVEZ

PARALEGAL
ANNA M. SACCO

October 1, 2020

**VIA ECF**
Honorable Lois Bloom
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    ***United States v. Baimadajie Angwang***
              ***Docket No. 20-837***

Dear Judge Bloom:

      I represent Baimadajie Angwang in the above-referenced criminal matter which is scheduled for the defendant's presentation of a bail package on October 2, 2020. Please accept this letter in support of Mr. Angwang's request to be released.

## BACKGROUND

      Baimadajie Angwang, a Marine Corp veteran, member of the Army Reserves, a New York City Police Officer and an American citizen was arrested on a complaint at his home in Williston Park, in Nassau County, on September 21, 2020. He was presented before the Honorable Roanne L. Mann for arraignment and a permanent order of detention was entered, without prejudice. He is incarcerated at the Metropolitan Detention Center and will be present via video for the October 2, 2020 hearing.

      The complaint charges Mr. Angwang with: 1) acting as an unregistered agent of the People's Republic of China (18 USC 951); 2) wire fraud (18 USC 1343); 3) making false statements (18 USC 1001); and 4) obstructing an official proceeding (18 USC 1512(c)). Counts 2, 3 and 4 are predicated upon the same allegations, that Mr. Angwang; 1) did not disclose his contact with an individual employed by the Chinese consulate on a security clearance application and; 2) that he did not disclose the fact that he regularly communicated with his family in Tibet.

1

## THE GOVERNMENT'S CASE AGAINST ANGWANG

The government has alleged that Mr. Angwang has; 1) "reported to the Chinese consulate on the activities of ethnic Tibetans"; 2) "spotted and assessed potential ethnic Tibetan intelligence sources in the New York metropolitan area and beyond"; 3) identified potential threats to the PRC in the New York Metropolitan area"; and 4) "provided consulate officials access to senior NYPD officials through invitations to official NYPD events"; (Government's detention memo at page 2).

The evidence, as outlined in the affidavit in support of the complaint, consists principally of wire-tapped telephone conversations between Mr. Angwang and a Tibetan consulate employee known as PRC #2. ("PRC" refers to the People's Republic of China). The government proffers in its detention memo that between June of 2018 and March of 2020, Mr. Angwang and PRC #2 communicated on 55 occasions via telephone calls and texts. The phone used by Mr. Angwang on all calls and texts was not a "burner phone", nor an encrypted spy phone. He used his personal cell phone. [1]

In the affidavit, the government details interactions between Mr. Angwang and PRC #2. In these conversation excerpts, it is clear that Mr. Angwang attempts to ingratiate himself with PRC #2. Angwang talks about "raising our country's soft power" and on one occasion sought "advice" from PRC #2 about whether or not to do an interview with a television station that was considered to be "anti-PRC". The government even highlights the fact that PRC #2 is referred to by Angwang as "boss", to bolster the impression that there is some supervisory authority at play. Used in this manner, "boss" is a common colloquialism frequently used by men to refer to other men who are anything but the "boss." These excerpts are presented in support of the government's contention that Angwang is operating at the direction of PRC #2 as an "asset" of the Chinese Communist Party and the People's Republic of China (PRC), and not loyal to the Tibetan separatist cause.

## ANGWANG'S TIBETAN HERITAGE AND HISTORY

Mr. Angwang is a 33-year-old ethnic Tibetan. After coming to the United States as a teenager, he returned to the village of his birth in Tibet. Inspired by his first experience with freedom, he was not mindful of the dangers of speaking out against the Chinese government. After he was granted a second visa to travel back to the United States, the Chinese police arrested him, and he was imprisoned for a few days. His parents complied with the local police chief's demand that they pay, what was effectively a ransom, and he was released. He was never charged with a crime or brought before a judge. Before he was released, Angwang was beaten by the police as punishment for openly expressing his views about the Chinese government's oppression of Tibetans.

---

[1] The complaint also refers to PRC #1, the Tibetan consulate employee who acted as the community liaison prior to PRC #2. Although the government gives detail about the number of contacts Angwang had with PRC #1, no information is proffered about how, or if, the contacts pertain to the charges.

2

At 17 years of age, Mr. Angwang again traveled to the United States on a student visa. He applied for and was granted asylum and would not return to Tibet until after he was granted United States citizenship in 2010.

Once in the United States, Mr. Angwang found employment and thereafter joined the United States Marine Corp in 2009. In 2010, while in the military, he became a naturalized United States citizen. He was assigned to an aviation group and was deployed on a seven-month tour in Afghanistan. Upon his return, he was stationed in San Diego and was honorably discharged in 2014. Thereafter, he joined the Army Reserves and moved to the New York area. Before joining the NYPD, he was employed by a family friend in the capacity of a translator and personal assistant. In 2016, he completed the NYPD academy and was commissioned as a New York City Police Officer, a job to which he dedicated himself.

*CHINA'S OPPRESSION OF TIBET*

As the Court is likely aware, the Chinese government has, for decades, engaged in a brutal oppression of the Tibetan people. There are estimates that over one million ethnic Tibetans have been murdered and thousands more imprisoned by the Chinese since 1950. The Chinese campaign against Tibet has notoriously included the destruction of some 6000 monasteries.

Both of Mr. Angwang's parents are ethnic Tibetans and still live in the village where he was born with his younger brother. The name "Angwang" is definitively Tibetan and translates to "vocal power." In 2016, Mr. Angwang married Chen Jiang, a non-Tibetan, Chinese woman. After the marriage, at the request of her husband, she legally changed her name to Angwang. When their daughter was born in 2017, she too was given a Tibetan name. While Mrs. Angwang's parents do not live in China, her grandparents (the child's great-grandparents) are alive in eastern China.

Essential to the government's theory of prosecution is that Mr. Angwang is loyal to the People's Republic of China and was betraying his own people. They allege that his mother is a member of both the People's Liberation Army and the Chinese Communist Party. [Gov't Detention Memo p.4] This is, in part, the basis for their conclusion that Mr. Angwang was motivated to help PRC #2 develop information about Tibetans living in New York.

It should be emphasized that the government does not take the position that Mr. Angwang engaged in any "spying" against the United States. The "information" that Angwang was supposedly providing to PRC #2 relates to Tibetans who are vocal about their opposition to the Peoples Republic of China. However, a careful reading of the affidavit and the detention memo leaves the reader wondering what, if any, information was actually provided. While it is fair to say that it seems that Angwang expressed a willingness to accommodate PRC #2's requests, it is far from clear that Angwang delivered anything, at least anything not already in the public domain and available to the public.

**WHO IS PRC #2?**

PRC #2, is a Chinese citizen of Tibetan heritage. He is also a person who will never appear in a Brooklyn courtroom. Although Tibetan, PRC #2 apparently demonstrated his loyalty to China to the extent that he was entrusted to become a community affairs employee at the consulate. His

principle, if not only, responsibility was to immerse himself in the Tibetan community in New York in order to assess whether visa applicants could be "trusted" to return to China without "causing problems." PRC #2 was empowered to "vouch" for any American of Tibetan ethnicity who had filed a visa application at the New York City consulate.[2] Anyone who was known to be vocal about the Tibetan separatist cause could be denied a visa.

Mr. Angwang, like many other American Tibetans, was beholden to PRC #2 who was viewed in the Tibetan community as a traitor to the separatist cause. If Mr. Angwang needed to see his parents or wanted to take his two-year old daughter to meet her grandparents or great-grandparents, PRC #2's approval was required. It is in this light that the Court should assess Mr. Angwang's solicitous tone and accommodating posture with PRC #2.

In excerpts set forth in the complaint, Mr. Angwang is clearly being careful to adopt an air of neutrality about the Tibetan cause when communicating with PRC #2. While he supposedly offers to help identify intelligence sources, he also advocates for the granting of ten-year visas for other Tibetans. (Complaint at ¶ 22.) With his family still living in Tibet, and his parents getting older, as well as, his wife's grandparents, the ability to travel on short notice was becoming a pressing concern. Notably, while the government takes great pains to show that Angwang was an "asset" of the PRC, it makes little sense given that he was being denied a visa for himself and also advocating for his fellow Tibetans.[3]

The government does not argue that Mr. Angwang was paid by the PRC or by PRC #2 to act as their asset. In fact, they have represented that they have no basis for believing that he was compensated for whatever it is that they claim he did. If Mr. Angwang, a United States Marine Corp veteran who pledged allegiance to our flag is not a traitor, what could possibly be his motive for indulging a Chinese bureaucrat with the power to keep him from visiting his parents?

## GOVERNMENT REQUEST FOR DETENTION ANALYSIS UNDER THE BAIL REFORM ACT

The government seeks pre-trial detention of a military veteran and police officer with no criminal record during a health emergency that has subjected federal inmates to Covid infection and long-term solitary confinement. This is not a "presumption" case under 18 U.S.C 3142(e). Inmates, as this Court is certainly aware, still have no family visitation and limited contact with their attorneys. In fact, I have been unable to speak with Mr. Angwang by telephone for several days even with this critical hearing approaching. While the conditions are likely still better than what is available in China, it is a punitive environment that falls far below the deplorable standards that have long been deemed acceptable. Of course, few are as "at risk" in prison as members of law enforcement. Compounding the harshness of a remand order in this case is the fact that the court system, while trying valiantly, does not appear prepared to handle jury trials for the foreseeable future given the uncertainty of the medical situation.

---

[2] CRP Consulates require visa applications to be filed in the geographical area in which the applicant lives.
[3] According to American Tibetans that I have now spoken with, a standard 30-day visa can take several months for a American Tibetan to obtain, if it is even granted.

4

*"UNUSUAL AND SUSPICIOUS" TRANSACTIONS*

The government begins its argument for detention by claiming that Mr. Angwang "enjoys access to significant liquid financial assets, much of which are located in the PRC..." (Gov't Memo at p. 4.) They argue that given his salary as a police officer, the large transactions are "extremely unusual and suspicious."

The government refers to wire transfers dating back to 2014, long before Angwang met PRC #2. They allege that "a US bank account *jointly held* in the name of Angwang and Mr. and Mrs. Angwang's wife received separate credits of $50,000 and $20,000 from an account held in the name of an individual at the Bank of China in New York.

First, the account in question was in the name of Chen Jiang only. (Redacted bank record attached). The credits in her account were from funds sent by her grandparents to assist in the purchase of a condominium in Queens, which occurred shortly thereafter. This is a typical intra-family transfer that the government attempts to paint as nefarious.

Much more importantly, Mr. Angwang and his wife, then called Chen Jiang, did not even meet until 2015. Given that Mr. Angwang has been under surveillance since 2017 and the government has waited this long to arrest him, a more meaningful and accurate investigation of his finances and lifestyle should be expected.

After living and working in the United States for nine years, Mr. Angwang sent $100,000 to his brother living in China in 2016. A month later, he wired $50,000 to a person the government describes, suspiciously, as "another individual." A few days after that, $49,985 was wired from Mr. Angwang's brother to Angwang's account in the United States. While we do not have access to the records, and almost no access to Mr. Angwang, we believe that the $50,000 transaction was never consummated, and those funds remained in the United States. Most importantly, these transactions occurred approximately two years before the relationships with the consulate officials which the government says began sometime in 2018. (Complaint at p. 5)

*ANGWANG'S PARENTS AND ASYLUM APPLICATION*

In its effort to depict Mr. Angwang as a PRC and communist party sympathizer, the government asserts that both of his parents are communist party members. Mr. Angwang denies that is the case and one can only guess at the basis for such a claim.

The government goes on to question "the manner in which Mr. Angwang obtained his U.S. citizenship." (Gov't memo – P. 5) They assert that his claim of being arrested and tortured by PRC security officials in Tibet, the claim that was offered in support of his asylum application, was false. The reason they seem to know this is not because they have produced evidence or an affidavit from someone who claims to know the truth. They refer only to the fact that Mr. Angwang has since travelled back to the PRC on several occasions and that his decision to do so is "not the actions of an individual who fears torture or persecution at the hands of the PRC". This is the basis for the government's claim that Mr. Angwang's U.S. citizenship was secured through false pretenses.

5

If it is possible to follow the reasoning, this is what the government is saying: Because Mr. Angwang has travelled back to China, the place of his birth where his parents and brother still live, it is not believable that he was arrested and beaten by PRC security officials when he was a teenager. He should be too fearful of torture and persecution to return. Therefore, he must have lied when he said he was arrested and beaten.

The government neglects to mention that <u>after</u> Mr. Angwang was tortured by the Chinese, he became a United States Marine and was deployed to Afghanistan. That he joined the Army Reserves and in 2016 became a police officer with the NYPD. Most importantly, they fail to mention how his status as a United States citizen would entitle him to protection from persecution in the PRC, something he did not have as a teenage Tibetan.

## ANGWANG'S REQUEST FOR "SPECIAL TRAVEL FAVORS"

The government's next argument focuses on the ten year visa or "special travel favors" that Mr. Angwang requested due to his relationship with the consulate. (Gov't memo p. 5) "Special travel favors"? Mr. Angwang, like anyone with Tibetan ethnicity, faces unremitting discrimination and mistreatment by the PRC both inside and outside of China. Outside of the country, their consulates systematically obstruct and frustrate the efforts of Tibetan Americans to return to China. There is no right to speak openly about Chinese oppression of Tibetans in China so when it occurs in the United States, the Chinese take action (or inaction) in the visa offices, like the one run by PRC #2.

Mr. Angwang was not requesting a "special travel favor." He was requesting what is universally available to all non-Tibetan, Chinese Americans who apply for 10-year visas – permission to go to China.

### A. Nature and Circumstances of the Offense Charged

With regard to the "secret" clearance that Mr. Angwang maintained in connection with his position with the U.S. Army Reserves, the government gives no indication that it uncovered anything to suggest that Mr. Angwang revealed his status as U.S. Army Reservist to PRC #2. In the end, there was simply no information of value conveyed to PRC #2, much less anything of a classified, secret, or military nature.

*RISK OF FLIGHT*

Arguing for detention, the government informs the Court that the "maximum sentence faced by Mr. Angwang is 55 years in prison." (Gov't memo p. 6). With due respect to the government, aggregating statutory maximums is what reporters do to sell papers. All candidates for release are entitled to have their "risk of flight" assessed in light of the actual likely punishment, not some hyper-theoretical possibility that has no connection to reality.

If Mr. Angwang were to be convicted of each of the four counts with which he is charged, it is highly improbable that he would be subjected to "consecutive" sentencing. The Federal Sentencing Guidelines would govern the Court's analysis and generate a much less severe outcome.

6

The FARA change under Count One, for example, does not even have a set sentencing guideline. Under USSG 2X5.1, where there is no "analogous" guideline, sentencing is to be determined by the factors set forth in 18 U.S.C. 3553. While the statutory maximum on the FARA charge is five years, a much more lenient sentence could be justified for a military veteran with no criminal history and a young child.

Counts Two, Three and Four charge the same conduct under different statutes, but all are predicated upon the filing of a security clearance form called an SF-86F, in May of 2019. Count Two, Wire Fraud, carries a base offense level of 6 and punishment, as the Court is well-aware, is largely dictated by the amount of the "loss". The government's theory is that by filing a false statement, Mr. Angwang "defrauded" the government out of money, i.e. the salary that he was paid by the U.S. Department of Defense.

As an Army Reservist, Mr. Angwang was paid approximately $20,000 per year. The "loss' analysis, assuming we include the time from May 2019 through the September 2020 date of his arrest, would involve approximately $25,000, a figure that equates with a 4- level increase under U.S.S. G. 2B1.1. As there are no application notes or specific offense characteristics that clearly apply, Mr. Angwang's guideline range, even without acceptance of responsibility points, would be a level 10. The advisory guideline range at level 10 is **6-12 months in prison.** If Mr. Angwang were to plead guilty to this charge and thereby qualify for a 2-level acceptance reduction, the advisory range would reduce to **0-6 months** at level 8.

Count 3 charges a violation of 18 U.S.C. 1001, making a false statement and would involve a guideline analysis that is almost identical to Count 2. With Count 4, charging that the filing of the form "obstructed an official proceeding", the sentencing analysis would proceed as follows: Under U.S.S.G 1512, the base offense level for this charge would be a level 14. There are a variety of potential aggravating specific offense characteristics that could give rise to a higher guideline, however, none of them apply. The advisory guideline in Criminal History Category 1 recommends a sentencing range of 15- 21 months. As always, the U.S.C. 3553 factors are available to be argued in support of a lesser sentence. A defendant who pleads guilty and accepts responsibility to this charge would be entitled to a two level reduction to level 12 and a sentencing range of 10-16 months.

This is a fair analysis, one we submit respectfully, the Court should follow in its assessment of whether there is truly a risk that Mr. Angwang would surrender his right to live in this country, rather than face prosecution.

### B. The Weight of the Evidence

The "weight" of the government's evidence has been laid bare in the affidavit and detention memo. The recorded conversations, as revealed, are hardly cause for national alarm or the media frenzy that followed Mr. Angwang's arrest. The government also points to "testimony of individuals who saw Angwang with his PRC handlers." Since there is no detail about this excerpted into the complaint or referenced in the detention memo, it is difficult to imagine it adds much

7

"weight" to the evidence this Court should consider. Quite frankly, whether Mr. Angwang and PRC #2 ever met is not likely to be a hotly contested issue should the case go to trial.[4]

As to electronic communications "between Angwang and others demonstrating his strong ties to the PRC through his family members and other individuals known and unknown," let us take a moment to break this down. The government is signaling that they have evidence that Mr. Angwang was involved in electronic communication with his family and other people they cannot identify. Was it email or phone calls? If it was email, apparently, the content was not so "weighty" that it deserved mention in the government memo or complaint. As to family contacts, Mr. Angwang is prepared to acknowledge that he communicated with his parents and brother in China. He and his wife used WeChat technology to video message the parents and grandparents so they could see the Angwang's daughter.

### C. The Defendant's History and Characteristics

The defendant's history and characteristics confirm that he has demonstrated his loyalty to this country and should be given every opportunity to reclaim the life he had ten days ago. He served honorably in the Marine Corp. and Army Reserves, where he was recently promoted to Staff Sergeant. He was a well-regarded police officer who had no disciplinary history. I have received phone calls from NYPD colleagues offering their concern and support and attesting to his work ethic and reputation in the department.

As to his "ties to the PRC" there is no question that Mr. Angwang has family in China. That said, for all of the efforts to ingratiate himself with PRC #2, he was never granted the 10-year visa he sought. The very fact that he was attempting to get one is compelling proof that he does not have dual citizenship, nor travel documents that would allow him to freely travel to the PRC should the Court grant release.

The government also speaks alarmingly of Mr. Angwang's access to "untold wealth" (Gov't memo p.6). Having had three years to scrutinize his financial records, there is little to suggest that the Mr. Angwang and his family are anything other than hard-working people who on rare occasion, help each other financially. The suggestion that the Angwang family in China is fabulously wealthy is quite simply, made up.

The government ends this phase of its argument with the caution that Angwang would not be extradited from China if he were to escape. That sounds right, however, given that China was not even willing to grant him a "special travel favor" visa, why would it be expected that they would welcome him now, especially after they read this letter.

They explain further, that the Court should be concerned that Mr. Angwang might evade prosecution by entering the mission or consulate in New York City. Assuming that the Chinese would let him in and that he would chose to be holed up like Mr. Assange, for the foreseeable future, is that something that is truly a concern? Is China going to cause an international incident

---

[4] The government refers to Angwang's visits to the Chinese consulate to imply nefarious dealings. Angwang did attend the consulate Tibetan New Year Event and the Tibetan Grand Opening, bringing with him his wife and his daughter.

8

over Mr. Angwang? And if this is a legitimate concern, it could be easily addressed with a travel restriction and monitoring.

**PROPOSED CONDITIONS OF RELEASE**

We propose that Mr. Angwang be released on a bond, secured by the family's residence, which has equity approximating $500,000. We would defer to the Court as to the amount of the bond. Mr. Angwang could be detained at home with his family via electronic monitoring. The Court could also impose travel restrictions to the EDNY, a condition that would address the government's dubious concern that Mr. Angwang might attempt to escape to the Chinese consulate in New York City. It should also be noted that Mr. Angwang's United States passport is in the possession of the government and a search of his house on the morning of his arrest revealed no other travel documents at his house.

We also propose the following co-signors to the bond. The following individuals have agreed to sign subject to the amount of the bond set by the Court and have committed to participating in the call that is scheduled for Friday. They are all United States citizens:

1. **HEIDI ANGWANG** – Mr. Angwang's wife and the co-owner of the home in Williston Park. She is employed as a licensed real estate broker.
2. **ZIYAN LIU** – Mother of Mr. Angwang's wife who is the co-owner of the house that will be offered as collateral.
3. **JOYCE DEASON** – Resident of North Carolina, son, Joshua Hughes, was in the United States Marine Corp. with Mr. Angwang
4. **DARCY LIU** – Resident of South Carolina, has known Mr. Angwang for fifteen years.
5. **JOSHUA HUGHES** – Resident of South Carolina. Marine Corp veteran, has known Mr. Angwang for 11 years and served together. Presently employed by U.S. Postal Service.
6. **SHUAN CARSON** – Resident of Maryland and has known Mr. Angwang since birth. Employed as a Restaurant manager.
7. **HECTOR YE** – Resident of New York and has known Mr. Angwang for five years. Employed as a physician's assistant.
8. **ZANE BUTLER** – Resident of Missouri and served in Marine Corp. with Mr. Angwang for 10 years. He is a self-employed licensed real estate broker.
9. **CHRISTOPHER ST.FORT** – Resident of Georgia and served in the Marine Corp. with Mr. Angwang and has known him for 10 years. He is employed as a Insurance adjuster.

More detailed information regarding the suretors will be forwarded separately to the government.

## CONCLUSION

While Mr. Angwang is proud of his Tibetan heritage, he is most proud of his American citizenship. He served honorably in our military and the New York City police force. He is supported not only by his wife, but an impressive list of former military and police colleagues, as well as, other Americans who have known him for an extended period of time.

The government has not argued that Mr. Angwang represents a danger to the community and there is no statutory presumption that he should be detained. The gravamen of the government's pitch for detention is an overblown claim that there is a risk he will try to flee to China to avoid prosecution. For all of the foregoing reasons, we respectfully request that that the Court deny the government's motion for detention and grant Mr. Angwang's request for release.

On behalf of Mr. Angwang and his family, I thank Your Honor for your consideration.

Very truly yours,

/s/ John F. Carman
JOHN F. CARMAN
(JC 7149)

Encl.
JFC/as