

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| DMP:MTK | *271 Cadman Plaza East* |
| | *Brooklyn, New York 11201* |

October 2, 2020

By ECF

The Honorable Lois Bloom
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza E.
Brooklyn, New York 11201

   Re: United States v. Baimadajie Angwang
      Magistrate Docket No. 20-837

Dear Judge Bloom:

  The government writes to respond to defendant's Baimadajie Angwang's motion for pretrial release. (ECF No. 8).

  On September 21, 2020, the defendant was arrested on a complaint charging him with acting as an illegal agent of the government of the People's Republic of China (the "PRC"), wire fraud, false statements and obstruction. The same day, the government submitted a detention memorandum (the "Detention Memo"), in which the government requested that the defendant be detained because he presented a serious risk of flight because of, among other things, his actions as an intelligence asset for the PRC, his significant ties to individuals in the PRC and to officials of the PRC Consulate in New York, his apparent access to financial resources that could be used to aid his flight, and the government's inability to extradite him from the PRC or even to secure his return if he entered sovereign PRC space at the PRC Consulate in New York. (See ECF No. 5). Pretrial Services also recommended detention on the ground that no condition or combination of conditions could assure the defendant's return to Court. Magistrate Judge Mann entered a permanent order of detention. (ECF No. 6).

  Because the government has already filed a detailed Detention Memo, setting forth the government's arguments why the defendant presents a serious risk of flight, the government incorporates those arguments by reference rather than repeating them here. In this submission, the government responds specifically to certain arguments and factual inaccuracies in the defendant's motion for release.

For the reasons set forth below, and in the Detention Memo, the government respectfully submits that the defendant continues to present a serious risk of flight and therefore that the Court continue the permanent order of detention against the defendant.

I. The Defendant's Arguments for Pretrial Release Relies on Misleading Facts

   A. The Defendant's Asylum Application, U.S. Naturalization and Travel

The defendant argues that there is nothing nefarious about his history of travel to the PRC, notwithstanding the fact that he sought asylum in the United States on account of being beaten and tortured by PRC security officials.[1] The defendant argues in his motion that is perfectly rational for someone who has claimed asylum from an oppressive regime to travel back to that country. See Def. Mem. at 5-6. This belies credulity. Rather, the defendant has traveled back to the PRC on account of his relationship with senior PRC officials, including members of the PRC Consulate in New York and his parents, both of whom have held positions in the PRC communist party and the People's Liberation Army, respectively. And that he has traveled to the PRC notwithstanding his "claim" of persecution shows that he has the ability to return in order to avoid prosecution in the United States.

   B. The Defendant's Relationship with PRC Official-2 and Information Provided to the Consulate

The defendant seeks to minimize his acts as a PRC agent by attempting to characterize PRC Official-2 – at whose direction and control the defendant acted – as a "community affairs officer" whose only task was to assess Tibetans for their suitability to obtain a visa. In fact, PRC Official-2 was no mere community affairs officer. PRC Official-2 was assigned to the "China Association for Preservation and Development of Tibetan Culture," a division of the PRC's United Front Work Department ("UFWD"). As discussed in the Detention Memo, this Department is responsible for, among other things, neutralizing sources of potential opposition to the policies and authority of the PRC. To achieve these goals abroad, the UFWD seeks to co-opt ethnic Chinese individuals and communities living outside the PRC. The UFWD officials often meet with local association groups whose purpose is to, among other things, connect Chinese emigrants from common geographic areas and ethnic backgrounds. The UFWD's purpose in meeting with these groups is to secure political, moral and financial support for the PRC and to maintain control over potentially problematic groups, such as religious and ethnic minorities. As the Complaint

---

[1] Angwang denied having sought asylum in the United States on his U.S. naturalization paperwork. Specifically, on Department of Homeland Security Form N-400, Application for Naturalization, the defendant was asked: "Have you ever applied for any kind of relief from removal, exclusion, or deportation?" The defendant answered "No." The government can provide the Court with a copy of the defendant's Form N-400, if necessary.

2

demonstrates, this is exactly the role that the defendant played on behalf of the PRC. Indeed, the defendant was perfectly situated to do so. As an ethnic Tibetan and an officer in the New York City Police Department, the defendant held a position of trust in the community and had access to sensitive information. One would be hard pressed to create a more perfect asset to the Consulate and, specifically, the UFWD, to maintain control over the Tibetan community in New York..

      C.      The Defendant's Requests for Visas from PRC Official-2

The defendant argues that, far from being a PRC asset, his relationship with PRC Official-2 was premised on his "advocating for his fellow Tibetans" to receive lengthier visas from the PRC. This is true. However, the defendant's motion conveniently omits the defendant's rationale behind the grant of lengthier visas. Indeed, the defendant sought lengthier visas on the basis that "it's hard to find people like us, the 100 percent type . . . so enthusiastic," the obvious inference being that the defendant should receive preferential treatment because he was assisting the Consulate with intelligence gathering. See Comp. ¶¶ 14-15. The defendant also advised PRC Official-2 that the issuance of lengthier visas to certain Tibetans could be a means to recruit intelligence assets. Id. These are not the actions of someone merely attempting to "ingratiate" himself with the Consulate and who now claims to be "loyal to the Tibetan separatist" cause. See Def. Mem. at 2. Rather, these are the acts of someone who is an intelligence asset for the PRC and who was acting under the direction and control of PRC officials.

II.      The Defendant Remains a Serious Risk of Flight

The defendant argues that he is not a risk of flight, in part because the government is in possession of the defendant's United States passport and "a search of his house on the morning of his arrest revealed no other travel documents at his house." In fact, a search of the defendant's home revealed that the defendant possessed the following:

- Two PRC passports of unknown ethnic Chinese individuals, including U.S. visas;

- A photocopy of a PRC passport of an unknown ethnic Chinese individual;

- A St. Kitts and Nevis passport of an unknown ethnic Chinese individual;

- Two New York State driver licenses and one New York State Identification Card of unknown individuals.

See Exhibit A. While it is unclear of the purpose or provenance of these travel documents, it appears that the defendant has the ability to procure identifications, foreign passports and

other documents that would aid his flight. These materials are further proof that the defendant is a flight risk, and that the government's seizure of his United States passport will do little to prevent him from fleeing.

Second, the defendant argues that should he travel to the PRC or enter a PRC facility in New York, it is unlikely that the PRC "would welcome him now." See Def. Mem. at 8. To the contrary, the PRC can only benefit from protecting the defendant, preventing his prosecution and aiding his flight. Indeed, the successful extraction of the defendant from the United States could be weaponized as a recruiting tool and likewise demonstrate to current PRC assets that the PRC will protect them and assist in evading prosecution. See United States v. Dan Zhong, 16 CR 614 (DLI) (denying defendant bail, in part, due to his access to the PRC Mission and PRC Consulate in New York).

Lastly, the defendant argues that he is not facing a significant term of incarceration should he be convicted, and cites various Sentencing Guidelines ranges of 21 months or below. See Def. Mem. at 6-7. However, given the defendant's egregious conduct, the government intends to seek a substantial term of incarceration. While the defendant correctly notes that there is no applicable Guideline for acting as an illegal agent of a foreign government, the district court has the discretion to sentence an individual convicted of such a charge to up to 10 years in prison, and numerous cases prosecuted under that section have yielded sentences up to the statutory maximum based on the severity of the offense. Other charges, such as the wire fraud count, carry up to 20 years' imprisonment. For someone who appears to have procured his naturalization by fraud, and will likely face the possibility of denaturalization at the conclusion of his criminal case, followed by his possible removal to the PRC, there is little incentive for him to remain in the United States to face the charges. Indeed, the defendant is captured informing PRC Official-2 that "if I don't keep climbing up [in the NYPD], I might as well be a government employee in China." See Comp. ¶ 20. Clearly, if the defendant was willing to move to the PRC due to a lack of promotion, he would be willing to flee to the PRC to avoid prosecution and a lengthy prison term.

III.    Conclusion

For all of the foregoing reasons, and the reasons previously set forth in the Detention Memo, the defendant should be detained pending trial. The government agrees with Pretrial Services that no condition or combination of conditions will assure the defendant's return to court, or his compliance with the Court's directives, and the Court

should thus continue the permanent order of detention pending trial previously entered by Judge Mann.

                                        Respectfully submitted,

                                        SETH D. DuCHARME
                                        Acting United States Attorney

By:   /s/ Michael T. Keilty
       Michael T. Keilty
       Assistant U.S. Attorney
       (718) 254-7000

cc:    Clerk of Court (LB) (by ECF)
       John Carman, Esq., counsel for the defendant (by email)

5