

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:MTK
F.#2019R00929

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 4, 2020

By ECF

The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  United States v. Baimadajie Angwang
     Docket No. 20-MJ-837

Dear Judge Komitee:

The government writes in response to the Court's request for further briefing following the government's appeal of United States Magistrate Judge Lois Bloom's bail determination. Specifically, the Court requested that the government provide the Court with (1) a realistic picture of the defendant's sentencing exposure, including a historical survey of sentences, on the charge of acting as an agent of a foreign government in violation of Title 18, United States Code, Section 951, and (2) evidence of the defendant's fraud in his asylum and naturalization proceedings, and the consequences of such fraud.

I.  The Defendant's Sentencing Exposure Under Section 951

Should he be convicted, the defendant faces a maximum sentence of ten years' imprisonment and a fine of not more than $250,000 or twice the pecuniary gain or loss of the offense. See 18 U.S.C. §§ 951, 3571(b) & (d). The Court may impose a period of not more than three years supervised release.

As discussed in the government's bail appeal hearing, the United States Sentencing Guidelines (the "Guidelines") do not expressly specify a guideline range for violations of 18 U.S.C. § 951. In such cases, the Guidelines counsel that a court should "apply the most analogous offense guideline" and "[i]f there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control." U.S.S.G. § 2X5.1. In numerous cases involving similar conduct, courts have determined that there is no sufficiently analogous

guideline for 18 U.S.C. § 951 and that 18 U.S.C. § 3553 controls. See, e,g., United States v. Butina, 18-CR-218, Doc. 124 (May 1, 2019 D.D.C.); United States v. Soueid, No. 11-CR-494, Doc. 59 (E.D. Va.); United States v. Chun, No. 16-CR-618, Doc. 17 at 10 (S.D.N.Y.); United States v. Alvarez, No. 05-CR-20943 (S.D. Fla.); United States v. Buryakov, No. 15-CR-73 (S.D.N.Y.), Doc. 158 at 6-7, 17; United States v. Duran, No. 07-CR-20999 (S.D. Fla.), Doc. 488 at 42-43. The government anticipates that that this will also be true here.

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The government acknowledges that sentences for violations of 18 U.S.C. § 951 and conspiracies to commit that offense vary greatly. We highlight some non-exhaustive examples below:

- In United States v. Alvarez, No. 05-CR-20943 (S.D. Fla.), the defendant entered a guilty plea to one count of conspiracy to act as an agent of Cuba in violation of §§ 371 and 951. Over a period of approximately 30 years, the defendant gathered information on prominent people, community attitudes, political developments and current events of interest to the Cuban government, and passed that information to Cuba. The Court imposed the statutory maximum of 60 months' imprisonment for the Section 371 conspiracy charge.

- In United States v. Dumeisi, No. 03-CR-664 (N.D. Ill.), the defendant traveled to Iraq to obtain training from the Iraqi Intelligence Service, received direction from intelligence officers of the Iraqi Mission to the United Nations, collected information on individuals and groups in the U.S. who were considered hostile to the government of Iraq under Saddam Hussein, published articles in an Arab language publication to goad opposition groups to respond for purposes of identifying them, and produced press ID cards for members of the Iraqi Intelligence Service to facilitate their travel within the U.S. The defendant was convicted after trial. The defendant was sentenced to 46 months' imprisonment.

- In United States v. Latchin, No. 04-CR-661 (N.D. Ill.), the defendant was convicted after trial for violating § 951 by acting as a sleeper agent on behalf of Iraq, even though there was no evidence that he ever took any covert action inside the United States. He was also convicted of unlawfully procuring citizenship, making false statements to the FBI and engaging in financial transactions with Iraq, and was sentenced to 48 months' imprisonment on each count.

- In United States v. Butina, No. 18-CR-218 (D.D.C.), the defendant pleaded guilty to one count of conspiracy to violate 18 U.S.C. § 951, in violation of 18 U.SC. § 371. The defendant was a Russian national acting within the United States at the direction and control of a foreign government official, working to spot and assess politically powerful and well-connected Americans. At sentencing, the government proffered that the crime warranted 24 months' incarceration prior to accounting for

2

the defendant's cooperation and 18 months' incarceration once her cooperation was taken into account. Consistent with that recommendation, the Court imposed a sentence of 18 months imprisonment.

- In <u>United States v. Doostdar</u>, No. 18-CR-255 (D.D.C.), the defendant pleaded guilty to one count of violating § 951 and one count of conspiring to do the same. The defendant was a dual U.S.-Iranian citizen who admitted to coming to the United States as part of a conspiracy to conduct surveillance on an Iranian opposition group in the United States and to provide information about that group's members to the Government of Iran. The defendant Doostdar directed his co-defendant, who resided in the United States, on how to conduct the surveillance and how to pass the information to the Government of Iran. The court sentenced the defendant to 38 months' incarceration on each count, to run concurrently.

- In <u>United States v. Soueid</u>, 11-CR-494 (E.D. Va.), the defendant pleaded guilty to Section 951 for collecting video and audio recordings of individuals in the United States and Syria who were protesting the regime of Bashar al-Assad as part of the Arab Spring, and providing contact information for those individuals to the Syrian government. The defendant was sentenced to 18 months' imprisonment.

- In <u>United States v. Fishenko</u>, 12-CR-626 (E.D.N.Y.), the defendant obtained advanced, technologically cutting-edge microelectronics used in a wide range of military systems, including radar and surveillance systems, missile guidance systems, and detonation triggers, from manufacturers and suppliers located within the United States and exported those goods to Russia. The defendant was sentenced to 120 months' imprisonment.

- In <u>United States v. Peng</u>, No. 4:19-CR-589 (N.D. Cal.), the defendant pleaded guilty to one count of violating § 951, and was sentenced to 48 months' incarceration and fined $30,000, in connection with his acting as an agent of the Chinese Ministry of State Security (MSS). The defendant admitted as part of his plea that, from 2015 to 2019, he retrieved classified information passed to him by MSS sources within the United States, paid cash to those sources, and flew with the classified information to China to deliver it to Chinese officials.

- In <u>United States v. Chun</u>, No. 16-CR-518 (S.D.N.Y.), the defendant pleaded guilty to violating § 951. The defendant was an FBI electronics technician with a Top Secret security clearance who sold sensitive FBI information to Chinese officials over a period of years. The parties agreed that, although there was no sufficiently analogous Guideline, a range of 21 to 27 months of incarceration was appropriate after factoring in acceptance of responsibility. The court imposed a sentence of 24 months' incarceration.

- In United States v. Shemami, 07-CR-20160 (E.D. Mi.), the defendant reported information to the Iraqi Intelligence Service relating to the activities of Iraqi expatriates in the United States who were opposed to Saddam Hussein. The defendant was charged with violating § 951, the International Emergency Economic Powers Act ("IEEPA"), in violation of 50 U.S.C. § 1701 et seq., and making false statements, in violation of 18 U.S.C. § 1001(a)(2). The defendant pled guilty to the IEEPA violation and was sentenced to 46 months' imprisonment.

- In United States v. Duran, No. 07-CR-20999 (S.D. Fla.), the defendant was convicted at trial of violating § 951 and conspiring to violate that statute. The government's case established that the defendant came to the United States as an agent of the Venezuelan government in an attempt to bribe and/or extort a U.S. citizen. See United States v. Duran, 596 F.3d 1283, 1295-96 (11th Cir. 2010). The court imposed a sentence of 48 months' incarceration on each count, to run concurrently.

- In United States v. Al-Awadi, No. 07-CR-20314 (E.D. Mich.), the defendant pleaded guilty to one count of violating § 951, stemming from his work reporting on Iraqi dissidents within the United States for the Iraqi Intelligence Services. The court sentenced the defendant to 18 months' incarceration.

- In United States v. Buryakov, No. 15-CR-73 (S.D.N.Y.), the defendant pleaded guilty to violating § 951, stemming from an agreement to take actions within the United States at the direction of a Russian government official. The parties agreed, pursuant to Fed. R. Crim. P. 11(c)(1)(C), to a sentence of 30 months' incarceration. The court accepted that agreement and imposed a sentence of 30 months.

- In United States v. Lin, No. 15-CR-601 (E.D.N.Y.), the defendant was sentenced to a probationary term of five years for violating Section 951 by assisting PRC officials with the PRC Mission to the United States to send unaccompanied baggage to the PRC in violation of applicable TSA regulations. Notably, though, in that case, the defendant did not collect the information and was not privy to the contents of the baggage that she facilitated.

The government agrees that it would not be appropriate to analogize the defendant's case to certain Section 951 offenses involving the sharing of classified or national defense information with foreign governments, which often carry much more substantial sentences. See, e.g., United States v. Chi Mak, No. 05-CR-293 (C.D. Ca.) (defendant who shared classified information concerning Navy warships and submarines with the PRC sentenced to 293 months' imprisonment); United States v. Campa, No. 98-CR-721 (S.D. Fla.) (defendant who shared national defense information about U.S. military installations with the Cuban government sentenced to 228 months' imprisonment). Accordingly, the government has not included those cases in this recitation of comparable cases.

Here, the defendant's actions on behalf of the PRC are comparable to the run-of-the-mill Section 951 cases, even those that involve some clandestine activity or espionage, because the defendant's actions were intended to provide intelligence to PRC government officials. It is well-settled that the "acts" for which a defendant can be held liable under Section 951 need not be "criminal or inherently wrongful." United States v. Duran, 596 F.3d 1283, 1293 (11th Cir. 2010). Nor do they need involve espionage or other clandestine intelligence gathering activity. In Duran, the Eleventh Circuit explained:

> [T]here is no suggestion in the language of [Section 951], the legislative history, or cases that convictions under § 951 require the conduct to be of that nature [referring to subversive activity or espionage]. To the contrary, the activities that fall within § 951's purview have never been expressly or by judicial interpretation limited to those bearing upon national security or even those which by their nature are criminal or inherently wrongful.

Duran, 596 F.3d at 1293; see also United States v. Lin, 2018 WL 3416524, at *4 (E.D.N.Y. July 11, 2018) ("§ 951 reaches beyond spying and subversive activities 'to *any* affirmative conduct undertaken as an agent of a foreign government.'" (quoting Duran, 596 F.3d at 1295)).

Here, the defendant is a member of the New York City Police Department ("NYPD") and United States Army Reserve ("USAR") who has served as an intelligence asset to the New York-based consulate of the People's Republic of China ("PRC") (the "Consulate"). Angwang has, among other things, (1) reported on the activities of ethnic Tibetans, and others, in the New York metropolitan area to the Consulate, (2) spotted and assessed potential ethnic Tibetan intelligence sources in the New York metropolitan area and beyond, (3) identified potential threats to the PRC in the New York metropolitan area, and (4) provided Consulate officials access to senior NYPD officials through invitations to official NYPD events.

Based on the cases set forth above, the government notes that the average sentence for defendants engaging in similar conduct appears to be in the range of four years' imprisonment, although there are cases in which defendants have been sentenced to more or less time for their actions. While this case is only in its initial stages, and the government has not formulated any specific sentencing recommendation at this time, the government notes that even the prospect of a sentence of four years' imprisonment (and potentially more) to be followed by the defendant's denaturalization and removal from the United States (which the government discusses below) supports the determination that the defendant is a flight risk.

5

II.     The Defendant's Asylum Application and Subsequent Naturalization

  A.     Applicable Asylum Law

To establish eligibility for asylum, a petitioner must show that he satisfies the statutory definition of a "refugee," i.e., that he has suffered past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or that he has a well-founded fear of future persecution on one of these grounds. 8 U.S.C. § 1101(a)(42); Jin Shui Qiu v. Ashcroft, 329 F.3d 140, 148 (2d Cir. 2003). If an applicant establishes past persecution, he triggers a rebuttable presumption of a well-founded fear of persecution and thus of eligibility for asylum; or, if he establishes a well-founded fear of future persecution, he is automatically eligible for asylum. See Li Yong Cao v. U.S. Dep't of Justice, 421 F.3d 149, 155 (2d Cir. 2005).

To be entitled to a withholding of deportation, the refugee must further establish that it is more likely than not that, were he deported, his "life or freedom would be threatened" on account of one of the privileged grounds mentioned above. See 8 U.S.C. § 1231(b)(3)(A); Diallo v. INS, 232 F.3d 279, 285 (2d Cir. 2000). A showing of past persecution threatening life or freedom creates a presumption of threats to life and freedom upon return.

  B.     Evidence of the Defendant's Fraud in Asylum and Naturalization Proceedings

Despite the defendant having alleged torture and persecution at the hands of PRC security officials, the investigation has revealed that Angwang has traveled back to the PRC on numerous occasions since his asylum application was granted. These are not the actions of an individual whose "life or freedom would be threatened" if he returned to the PRC. See 8 U.S.C. § 1231(b)(3)(A). Further evidence of the defendant's fraud in his asylum and naturalization proceedings is listed below[1]:

- As part of his asylum application, Angwang submitted a letter allegedly written by his brother in the PRC; the same brother who is currently serving as a reservist in the PRC's People's Liberation Army ("PLA"). Angwang's brother stated that the PRC considers Angwang a counter-revolutionary who is guilty of high treason. He further tells Angwang that Angwang should never return to his hometown and should never contact his parents directly. As discussed in the Complaint, Angwang's mother is a PRC communist party member. Notwithstanding these dire warnings, Angwang has returned to the PRC on numerous occasions and has been in frequent contact with his parents.

---

[1] The information proffered in this letter is drawn from the documents in the government's possession. The government is prepared to provide the Court with the referenced documents should the Court request it.

6

- On December 22, 2005, Angwang was denied asylum by an Immigration Officer who found his testimony not to be credible and lacking in detail. For example, Angwang was unable to provide specific details about his arrest. Angwang subsequently provided rebuttal evidence to the "Notice of Intent to Deny," but that evidence was deemed to be insufficient. Nevertheless, Angwang was ultimately granted asylum by an Immigration Judge.

- In 2006, Angwang was placed in deportation proceedings and remained in deportation proceedings until his asylum was granted in 2007. Angwang received numerous documents referencing his impending deportation and removal.

- On May 20, 2010, in connection with his citizenship proceedings, Angwang submitted an "N-400 Application for Naturalization." Angwang was asked the following questions and provided the following false answers:

  (1) "Have you ever been a member of or in any way associated with (either directly or indirectly) with the Communist Party?" Angwang answered "No." However, the evidence (including identifications and documents) demonstrates that Angwang's mother is a PRC communist party member. Angwang corroborated this fact when he informed PRC Official-2 that his mother used to write reports similar to the reports written by PRC Official-2. See Complaint ¶ 12.

  (2) "Have you ever been ordered to be removed, excluded, or deported from the United States; have you ever applied for any kind of relief from removal, exclusion, or deportation." Angwang answered "No."

  (3) "Have you ever been arrested, cited or detained by any law enforcement officer for any reason?" Angwang answered "No." The form makes clear that this question encompassed both foreign and domestic arrests. As the Court is aware, Angwang's entire asylum application was premised on his arrest and persecution at the hands of PRC security officials.

  (4) "Have you ever been in jail or prison?" Angwang answered "No." The form makes clear that this question encompassed both foreign and domestic jails and prisons. Again, Angwang's entire asylum application is based on being beaten and tortured in a PRC jail for a period of ten days.

- Following the grant of asylum, Angwang filled out a Form I-485, "Application to Register Permanent Residence or Adjust Status." Angwang was asked the following questions and provided the following false answers:

    (1) "Have you ever, in or outside the United States done any of the following: been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law or ordinance, excluding traffic violations?" Angwang answered "No." Again, Angwang's entire asylum application was premised on his arrest, torture and imprisonment by the PRC.

    (2) "Have you ever been a member of, or in any way affiliated with, the Communist Party?" Angwang answered "No."

- As part of his asylum application Angwang stated that he was severely beaten and tortured by PRC security forces. Angwang stated that he still suffers from the effects of the torture he endured in prison. For example, Angwang informed the Immigration Officer that he sometimes suffers from headaches, an involuntarily shaking right hand and that he is unable to carry heavy objects in his right hand. Angwang has never listed any of these ailments on any of his NYPD or USAR medical screening sheets. Despite claiming that he has a shaking right hand and is unable to carry heavy objects, Angwang has somehow served as United States Marine, NYPD Officer and a member of the USAR.

- In May 2008, after his grant of asylum, Angwang conducted an interview with SinoVision, a U.S.-based Chinese language television network. Angwang was interviewed in connection with his donation of money to a relief fund following an earthquake in Sichuan Province, PRC. Angwang stated that he was born and raised in Sichuan and has a deep love for the land. Angwang further stated that he was in the United States on an F-1 student visa in order to study Economic management in Queen University in North Carolina. Angwang stated that he planned to return to the PRC following his graduation. These were obvious lies given Angwang's recent grant of asylum based on a fear of persecution in the PRC.

Based on his lies during the asylum and citizenship process, Angwang may be subject to denaturalization and removal from the United States following the conclusion of these criminal proceedings. Although the government cannot predict at this time whether that will come to pass, the government notes that the prospect of denaturalization and removal supports the government's argument that Angwang is a flight risk. If Angwang might well be removed to the PRC at the conclusion of his criminal case regardless of the outcome, there is far less incentive for him to stay in the United States to face those criminal charges, given that the weight of the evidence – and therefore the prospect of a conviction and term of imprisonment – is overwhelming.

III.       <u>Conclusion</u>

        For all of the foregoing reasons, the defendant should be detained pending trial. The government respectfully submits that no condition or combination of conditions will assure the defendant's return to court, or his compliance with the Court's directives, and the Court should thus enter a permanent order of detention pending trial.

                              Respectfully submitted,

                              SETH D. DUCHARME
                              Acting United States Attorney

                     By:    <u>/s/ Michael T. Keilty</u>
                              Michael T. Keilty
                              Assistant U.S. Attorney
                              (718) 254-7528

cc:      Clerk of Court (by email)
          Defense counsel (by email)